## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GABRIEL GUSTAFSON, | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Civil No. 3:18-cv-1026 (MPS) |
| | : | |
| NANCY A. BERRYHILL, ACTING | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY | : | |
| | : | |
| *Defendant*. | : | |

## <u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

In this appeal from the Social Security Commissioner's denial of supplemental security income and disability insurance benefits, Gabriel Gustafson argues that the Administrative Law Judge (ALJ) erred because (1) he failed to evaluate the opinion of agency personnel; (2) he failed to properly apply the treating physician rule; (3) he failed to evaluate the opinions of non-acceptable medical sources; (4) he failed to properly assess the opinions of consultative examiners; (5) he failed to ask the vocational expert about the same residual functional capacity (RFC) assessment he had found applied to Mr. Gustafson; (6) he failed to properly evaluate Mr. Gustafson's connective tissue disorder, headaches, and obesity; (7) he failed to properly assess Mr. Gustafson's statements concerning the intensity, persistence, and limiting effects of his symptoms; (8) his determination that Mr. Gustafson did not need a cane was not supported by substantial evidence; and (9) his determination of Mr. Gustafson's RFC was not supported by substantial evidence. He also argues that the ALJ who presided over Mr. Gustafson's

administrative hearing was not appointed in conformity with the Appointments Clause. Finally, he argues that the Appeals Council erred when it failed to consider new evidence. I agree with Mr. Gustafson's argument that the ALJ did not properly evaluate the opinions of two treating physicians and two other sources. I remand on those bases and do not reach Mr. Gustafson's remaining arguments.

I assume the parties' familiarity with Mr. Gustafson's medical history (summarized in a stipulation of facts filed by the parties, ECF No. 21-2, which I adopt and incorporate herein by reference), the ALJ opinion, the record, and the five sequential steps used in the analysis of disability claims. I cite only those portions of the record and the legal standards necessary to explain this ruling.

## I.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision pursuant to . . . 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the correct legal principles were applied in reaching the decision, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). As such, the Commissioner's decision "may be set aside only due to legal error or if it is not supported by substantial evidence." *Crossman v. Astrue*, 783 F. Supp. 2d 300, 302–03 (D. Conn. 2010). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla or a touch of proof here and there in the record." *Id.*

## II.    DISCUSSION

Mr. Gustafson filed a Title II application for disability insurance benefits ("DIB") as well as a Title XVI application for supplemental security income ("SSI"). R. 19. Benefits were denied under both applications. R. 37. I address the ALJ's decision with respect to each application separately as the time period relevant to the two applications differs.

### A.    SSI

#### 1.    *Relevant Time Period*

To be entitled to an award of supplemental security income, a claimant must demonstrate that he or she became disabled at any time before the ALJ's decision. *Frye ex rel. A.O. v. Astrue*, 485 Fed. Appx. 484, 485 n.1 (2d Cir. 2012) (noting that, for SSI benefits, the relevant time period is from "the date the SSI application was filed" to "the date of the ALJ's decision"); *see also DeMico v. Berryhill*, 2018 WL 2254544, at *6 n.8 (D. Conn. 2018) ("[T]o be entitled to an award of Supplemental Security Income, a claimant must demonstrate that he or she became disabled at any time before the ALJ's decision."). The ALJ's decision in this case was issued on January 31, 2018. R. 37. Thus, with respect to his application for supplemental security income, Mr. Gustafson must prove that he became disabled within the meaning of the Social Security Act before January 31, 2018.

## 2. *Treating Physician Rule*[1]

Mr. Gustafson argues that the ALJ failed to comply with the treating physician rule in evaluating the opinions of Dr. Micha Abeles and Dr. John Menoutis. ECF No. 21-1 at 4-7. Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted). "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). The Second Circuit has made clear that:

> To override the opinion of the treating physician . . . the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist. After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.

*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal citations, quotation marks, and alterations omitted). "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.*

---

[1] For claims filed on or after March 27, 2017, a new set of regulations apply. These new regulations do "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 416.920c(a). But since Mr. Gustafson filed his claim on October 26, 2015, R. 19, the treating physician rule applies. *See Claudio v. Berryhill*, 2018 WL 3455409 at *3 n.2 ("Since [the plaintiff] filed her claim before March 27, 2017, I apply the treating physician rule under the earlier regulations.").

### a) Dr. John Menoutis

Dr. Menoutis completed an RFC questionnaire on January 10, 2018. R. 822-825. He lists Mr. Gustafson's diagnoses as "PTSD, depression, fibromyalgia, cervical spinal stenosis;" explains that there was an "MRI showing cervical stenosis;" and notes that the "severity of pain [is] mostly in [the] neck from cervical stenosis [and] other pain [illegible] fibromyalgia." R. 822. He determined that Mr. Gustafson's pain or other symptoms would "frequently" or "constantly" interfere with the attention and concentration needed to perform even simple work tasks; that he could sit and stand/walk less than 2 hours in an 8-hour workday; that he would have to take "5 to 20" unscheduled breaks during an 8-hour workday with each break lasting "5 to 10" minutes; that he must use a cane or other assistive device; that he could never carry 10 pounds or more; that he could rarely look down, turn his head right or left, look up, or hold his head in a static position; that he could use his hands and fingers for fine manipulations, grasping, and reaching only 60% of the time during an 8-hour work day; and that he would likely be absent from work more than 5 days a month. R. 823-25. The ALJ assigned "little weight" to this opinion, explaining that "it is inconsistent with the medical evidence of record." R. 33. I find that the ALJ erred in his evaluation of Dr. Menoutis's opinion.

The first *Greek* factor requires an ALJ to consider the "frequency, length, nature, and extent of treatment." *Greek*, 802 F.3d at 375. Although a "slavish recitation of each and every factor" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," *Atwater v. Astrue*, 512 Fed. Appx. 67, 70 (2d Cir. 2013), no such clarity exists here because the ALJ failed to even mention Mr. Gustafson's treating history with Dr. Menoutis, which was substantial. From the record, it appears that Dr. Menoutis began treating Mr. Gustafson at least as early as September 2016, ECF No. 21-2 at 12, and that he saw Mr. Gustafson "2 to 3 times per

year" for twenty minutes to one hour each time. R. 822. Without an explanation of how the ALJ considered this treating history, or any indication that he considered it at all, I cannot determine whether he properly applied the law in determining that the opinion is entitled to "little weight."

The second and third *Greek* factors require explicit consideration of "the amount of medical evidence supporting the opinion" and "the consistency of the opinion with the remaining medical evidence." *Greek*, 802 F.3d at 375. The ALJ points to various treatment notes and records to support his finding that Dr. Menoutis's opinion was inconsistent with the medical evidence of record. R. 33. But the evidence he identifies does not constitute "good reason[]" to assign "little weight" to the opinion in its entirety. The ALJ begins by explaining that the opinion was inconsistent with the record because the record showed that Mr. Gustafson "was consistently alert, fully oriented, well nourished, well developed, calm, cooperative, well groomed, and in no acute distress." R. 33. The ALJ uses this phrase repeatedly in his ruling to reject opinion evidence. R. 30, 31, 32, 33. But this refrain is not particularly responsive to the opinions of Dr. Menoutis or (as discussed below) Dr. Abeles. With the exception of "no acute distress," the phrase describes Mr. Gustafson's mental state and does not contradict Dr. Menoutis's findings, which are largely about Mr. Gustafson's physical limitations, i.e., that he could rarely turn his head, could use his hands for fine manipulations only 60% of the time, could not stand or walk for more than 2 hours in an 8-hour workday, must use a cane, and so on. Moreover, "no acute distress" is consistent with Dr. Menoutis's opinion as many of the limitations he identifies are chronic as opposed to acute.

In addition, the ALJ does not provide specific citations to support his determination that Mr. Gustafson was "consistently" alert, fully oriented, well groomed, in no acute distress and so on; instead, he cites Exhibits 7F, 11F, 20F, 22F, 23F, and 26F in full. It is therefore difficult to

6

determine which specific records in these lengthy exhibits he relied on. Worse, these exhibits include several treatment notes that are *inconsistent* with the ALJ's refrain that Mr. Gustafson "was consistently alert, fully oriented, well nourished, calm, cooperative, well groomed, and in no acute distress." R. 33; *see, e.g.*, R. 574 (treatment note in 7F stating that Mr. Gustafson was "disheveled," had "poor" insight, and "limited" judgement); R. 578 (treatment note in 7F noting that he was "disheveled" and has "chronic pain"); R. 580 (treatment note in 7F noting "mood irritable" and "angry/hostile affect"); R. 616 (treatment note in 11F stating that he complained "most specifically" about a "worsening headache associated with nausea and vomiting from a unclear etiology"); R. 621 (treatment note in 11F noting that "[p]atient appears to be in significant pain, grimacing throughout interview"); R. 626-27 (treatment note in Exhibit 11F noting "in distress as a result of pain" and "severe neck pain and shoulder pain"); R. 843 (treatment note in Exhibit 26F noting "diffuse pain with movement of all joints in his extremities"). Thus, to the extent the ALJ's blanket citation of these records is intended to describe them in their entirety, his description is not supported by substantial evidence, because the exhibits as a whole do not show that Mr. Gustafson was "*consistently* alert, fully oriented, well nourished, well developed, calm, cooperative, well groomed, and in no acute distress." R. 33 (emphasis added).

To be sure, there are also entries in the cited exhibits that support the characterization in the ALJ's refrain, *see, e.g.,* R. 777 (treatment note in 20F reporting that therapy was going "very well," physical therapy was helping his hips, he had a calm and cooperative affect, and presented with appropriate grooming); R. 792 (treatment note in 22F reporting "[n]o acute distress" and largely normal findings), and it is within the ALJ's sole province to weigh and resolve conflicts in the medical evidence, *Jeffrey A. on behalf of J.M.A. v. Saul*, 2019 WL 3081092, at *7

(N.D.N.Y. July 15, 2019) (citing cases). But it does not satisfy the ALJ's obligation to give "good reasons" for rejecting a treating physician's opinion to point vaguely to a pile of lengthy exhibits containing mixed evidence about a claimant, some of which supports the treating physician's opinion and little of which directly contradicts it.

Next, the ALJ determined that Dr. Menoutis's opinion was inconsistent with the medical evidence of record because the record showed that Mr. Gustafson "had significant improvement in his neck and upper back," and "improvement in the tingling and numbness in his upper activities" in May 2017. R. 33. But a finding of "significant improvement" or "improvement" does not identify a baseline and is not necessarily inconsistent with the functional limitations identified by Dr. Menoutis; that is, Mr. Gustafson's condition may have been so poor that he continued to have significant functional limitations even after his condition improved.

Finally, the ALJ points to treatment notes from an October 2017 physical examination by Dr. Menoutis that indicated "no abnormal findings" to support his determination that Dr. Menoutis's opinion is inconsistent with the record. R. 33. Although this treatment note suggests that Mr. Gustafson was doing better than he claimed at the hearing before the ALJ, it provides insight into Mr. Gustafson's condition only at a particular moment in time. It was thus incumbent on the ALJ to give "good reasons" for crediting this treatment note instead of other notes from the same doctor showing abnormal findings.[2] In his RFC, Dr. Menoutis notes that Mr. Gustafson has good days and bad days, R. 824, which is consistent with the fluctuations in Mr. Gustafson's condition reflected in the treatment records. Under these circumstances, the treatment note

---

[2] It is also noteworthy that Dr. Menoutis, in the same treatment note indicating "no abnormal findings," indicates that Mr. Gustafson is "[s]eeing [n]eurosurgery" for "[c]ervical spinal stenosis" and "seeing [r]heumatology" for "[f]ibromyalgia," R. 794

showing no abnormal findings in October 2017 is not on its own a "good reason[]" to give little

weight to Dr. Menoutis's opinion. Rather, the ALJ must explain why he viewed that note instead

of other, less sanguine notes and assessments by the same doctor as a better reflection of Mr.

Gustafson's overall functional capacity. This also underscores the importance of the ALJ's

failure to "explicitly consider" the first *Greek* factor, *Greek*, 802 F.3d at 375, as the treatment

note that the ALJ relies on must be understood in light of the frequency and length of the overall

treating relationship.

In sum, I find that the ALJ erred in his evaluation of Dr. Menoutis's opinion by failing to

adequately address the *Greek* factors and give good reasons for assigning "little weight" to the

opinion.[3]

### b) Dr. Micha Abeles

Mr. Gustafson treated with Dr. Abeles in 2010 and 2011, did not treat with him for

several years, and then re-established care in January 2016. R. 605; ECF No. 21-2 at 1, 4. Dr.

Abeles authored a report on March 10, 2016, indicating that he was treating Mr. Gustafson for

"[d]isc disease," which was "a pre-existing condition" with an approximate onset date in "[A]ug

2015." R. 564. In the report, Dr. Abeles noted that Mr. Gustafson had a "herniated cervical disc

with radiculopathy," is experiencing "increasing pain," and would be unable to work for "6

months or more." *Id*. He also opined that Mr. Gustafson could never lift more than 10 pounds;

could never carry more than 5 pounds; could not sit for more than 3 hours during an 8-hour

---

[3] The fourth *Greek* factor requires an inquiry into "whether the physician is a specialist." *Greek*, 802 F.3d at 375. Here, the ALJ notes that Dr. Menoutis is "a primary care physician," R. 27, suggesting that he considered in substance this factor.

workday; could not push and pull arm controls with his left hand; and could never crawl. R. 565-66. The ALJ assigned "little weight" to this opinion, stating that "it is inconsistent with the medical evidence of record." R. 32. I find that the ALJ erred in his evaluation of Dr. Abeles's opinion.

As previously discussed, the first *Greek* factor requires an ALJ to consider the "frequency, length, nature, and extent of treatment," and the fourth factor requires an inquiry into "whether the physician is a specialist." *Greek*, 802 F.3d at 375. Although there is a gap in Mr. Gustafson's treating history with Dr. Abeles and the report was issued only a few months after they re-established a treating relationship, Dr. Abeles treated Mr. Gustafson in 2010 and 2011 and presumably had some familiarity with his conditions and symptoms from that time. ECF No. 21-2 at 1; R. 605. The ALJ did not explain how this treating history with Dr. Abeles factored into his decision to assign "little weight" to the opinion. And although the ALJ notes that Dr. Abeles is "a rheumatologist," R. 32, he does not explain how the doctor's status as a specialist informed his decision about the weight to assign his opinion. The regulations state that the Commissioner "generally give[s] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 416.927(c)(5).

The second and third *Greek* factors require explicit consideration of "the amount of medical evidence supporting the opinion" and "the consistency of the opinion with the remaining medical evidence." *Greek*, 802 F.3d at 375. But here, as with the ALJ's analysis of Dr. Menoutis's opinion, the evidence the ALJ identifies does not constitute "good reason[]" to assign "little weight" to Dr. Abeles's opinion in its entirety. First, echoing his refrain, the ALJ determined that the opinion was inconsistent with the medical evidence of record because the

"claimant was consistently alert, fully oriented, well nourished, well developed, calm, cooperative, well groomed, and in no acute distress." R. 32. He also observed that the "claimant reported that his pain did not worsen until August of 2015." *Id*. But none of these findings is inconsistent with the key functional limitations identified by Dr. Abeles; namely, that Mr. Gustafson could never lift more than 10 pounds; could never carry more than 5 pounds; could not sit for more than three hours during an eight-hour workday; could not push and pull arm controls with his left hand; and could never crawl. R. 565-66.

Next, the ALJ notes that Dr. Abeles's opinion is inconsistent with x-rays from November 2015 that "showed no acute abnormalities." R. 32. But simply because there are no "acute" abnormalities does not mean that there are no abnormalities that could cause functional limitations of the type identified by Dr. Abeles. Indeed, while the radiology report in Exhibit 3F—the exhibit the ALJ cited to support his finding of no acute abnormalities—does state that "no acute abnormality is radiographically demonstrated," it also states that "[c]ervical spondylosis [is] most notable at C5-C6 and C6-C7" and that there is "moderate intervertebral disc height loss with endplate sclerosis and spurring at C6-C7." R. 515. In addition, treatment notes in the same exhibit by Dr. Garrity, a primary care physician, indicate that Mr. Gustafson has "polyneuropathy" and "high pain levels," R. 511, and that he has limited cervical range of motion and limited lumbar spine range of motion, R. 512. Less-than-acute abnormalities and limited range of motion are consistent with the functional limitations identified by Dr. Abeles.

Finally, the ALJ states that Dr. Abeles's opinion is inconsistent with the record because an "MRA of [Mr. Gustafson's] neck in June of 2016 showed no significant stenosis or luminal filing defect" and the "MRI of [Mr. Gustafson's] cervical spine in June of 2016 showed only moderate problems." R. 32, 835. But the lack of "significant" stenosis is not inconsistent with

Dr. Abeles's opinion—indeed the treatment notes stating that there is no "significant" defect also states that there is "moderate bilateral neural foraminal stenosis at C6-7," "moderate spinal canal and moderate bilateral neural foraminal stenosis of C5-6," R. 835, "[c]ervical spinal stenosis," R. 838, "complex presentation with moderate cervical spondylosis," R. 839, and that there is an appointment "pending for rheumatology for h/o [history of] of possible MCTD [mixed connective tissue disease] and possible contribution to his spinal spondylosis," R. 839. The ALJ does not explain why a less than "significant" defect or test results showing only "moderate problems" are inconsistent with Dr. Abeles's assessment of Mr. Gustafson's functional capacity.

In sum, I find that the ALJ erred in his evaluation of Dr. Abeles's opinion by failing to adequately address the *Greek* factors, and by failing to give good reasons for assigning "little weight" to the opinion.

### 3. *Other Sources*

Mr. Gustafson also argues that the ALJ erred by failing to properly evaluate the opinions of licensed clinical social worker Gina Chiara and physical therapist Patrick McCrystal. ECF No. 21-1 at 7-8, 10-12. The ALJ assigned "little weight" to Ms. Chiara's opinion, R. 32, and appears not to have considered Mr. McCrystal's evaluation as opinion evidence at all. Although Ms. Chiara and Mr. McCrystal are not medical sources, and therefore their opinions are "not presumptively entitled to controlling weight," *Sirris v. Colvin*, 2016 WL 6090585, at *3 (W.D.N.Y. Oct. 19, 2016), their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects," *Saxon v. Astrue*, 781 F. Supp. 2d 92, 103 (N.D.N.Y. 2011) (internal quotation marks omitted). Social Security Ruling 06-03p provides guidance on how to review such opinions:

In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

• Medical sources who are not "acceptable medical sources," such as . . . licensed clinical social workers . . .[and] chiropractors . . .

Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

. . . .

With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *2-3 (Social.Sec.Admin. 2006). The ruling goes on to explain that "[a]lthough the [*Greek* factors] explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'" *Id*. at *4. In reviewing "other source" opinions, then, the ALJ may consider "(1) whether the source examined the claimant; (2) whether the opinion was rendered by a treating source; (3) whether the source presented relevant evidence to support the opinion; (4) whether the opinion is consistent with the record as a whole; (5) whether the opinion was rendered by a specialist in his or her area of expertise; and (6) other factors that tend to support or contradict the opinion." *Sirris*, 2016 WL 6090585, at *3. "The [ALJ] generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent

reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939 at *6. Ultimately, "even if an ALJ is free to conclude that the opinion of [a] 'non acceptable source' . . . is not entitled to any weight, the ALJ . . . must explain that decision." *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 183 (E.D.N.Y. 2011) (internal quotation marks and alterations omitted). Here, the ALJ's explanation of his weight allocation is inadequate with respect to Ms. Chiara's opinions and non-existent with respect to Mr. McCrystal's.

### a) Licensed Clinical Social Worker Gina Chiara

Ms. Chiara completed an RFC questionnaire on September 19, 2016, a medical source assessment on September 21, 2016, and a psychiatric evaluation form on September 21, 2016. R. 640-54. She opined that Mr. Gustafson had depression, anxiety, panic attacks, and PTSD, R. 640; that "long term intensive treatment [was] required," *id.*; that his symptoms would "constantly" interfere with the attention and concentration needed to perform simple work tasks, R. 641; that he would be absent from work for more than five days a month, R. 643; and that his impairments could be expected to last at least twelve months, R 640. She also stated that he "has experienced significant + persistent deterioration in general, overall functioning and specifically in memory, concentration, ability to leave home alone and social interaction," and that "[c]urrent symptoms include inability to focus, carry out tasks with multiple steps, emotional dysregulation with frequent crying spells, panic attacks, anxiety, depression, irritability, fear of strangers, hyper-vigilance, avoidance of triggers, nightmares, flashbacks, and missing points of time." R. 647; *see also* R. 644-46 (noting that he would have great difficulty with understanding, memory, concentration, persistence, social interaction, and "adaption"); R. 649-50 (noting similar symptoms and limitations); R. 651-54 (noting difficulty with daily living activities, social

functioning, and maintaining concentration). The ALJ assigned "little weight" to Ms. Chiara's opinion, explaining that "it is inconsistent with the medical evidence of record." R. 32.

I find that the ALJ erred by failing to discuss the frequency of Ms. Chiara's interaction with Mr. Gustafson and by failing to adequately explain why her opinion is inconsistent with the medical evidence of record. First, Ms. Chiara saw Mr. Gustafson very frequently between August 9, 2016 and November 29, 2017. ECF No. 21-1 at 12; ECF No. 21-2 at 11-15, 17; R. 640-76, 725-63, 806-19. She thus had a long treating history with Mr. Gustafson and spent considerable time with him. It is true that she completed formal opinions of his functional capacity only approximately six weeks after she began working with him, but because she saw him "1 to 2 times a week," R. 649, those opinions are still premised on more interaction with Mr. Gustafson than the opinions of many—if not all—the physicians who also authored opinions in this case. *Hernandez*, 814 F. Supp. 2d at 187 (explaining that "other source evidence, including reports from social workers, may play a vital role in the determination of the effect of plaintiff's impairment, especially where a social worker was the sole treating source that had a regular treatment relationship with the plaintiff") (internal quotation marks and citation omitted). The ALJ did not discuss Ms. Chiara's treating history with Mr. Gustafson or how the treating relationship factored into his decision to accord her opinions "little weight."

Second, the ALJ did not adequately explain why Ms. Chiara's opinion is inconsistent with the medical evidence of record. The ALJ repeated his refrain that Mr. Gustafson "was consistently alert, fully oriented, well nourished, well developed, calm, cooperative, well groomed, and in no acute distress" and cited Exhibits 7F, 11F, 20F, 22F, 23F, and 26F in full. R. 32. As discussed in Section II.A.2.a, the records in these exhibits include a number of treatment

notes that are inconsistent with the ALJ's findings, and thus do not support the ALJ's finding that Mr. Gustafson "consistently" exhibited these qualities.

Next, the ALJ states that Ms. Chiara's opinions are inconsistent with the record because Exhibit 11F shows that Mr. Gustafson's "fund of knowledge, language, attention span, and memory were all normal and/or intact." R. 32. But this exhibit also contains treatment notes that bolster Ms. Chiara's findings with respect to Mr. Gustafson's social limitations. R. 620 (treatment note in 11F stating that "[h]e does have multiple neurovegetative symptoms of depression"); R. 621 (treatment note in 11F stating that he was "[a]nxious" and had an "[i]nappropriate mood and affect"). Again, citing this 24-page exhibit as a whole makes the Court's review more difficult because the exhibit includes some treatment notes that are consistent with Ms. Chiara's assessments and the ALJ does not explain how he reconciled those notes with his ultimate determination that the exhibit is inconsistent with Ms. Chiara's opinions.

Finally, the ALJ explains that Ms. Chiara's opinion is inconsistent with the record because Mr. Gustafson reported that his psychiatric therapy and breathing exercises were helpful in February 2017; and both he and his aide reported that therapy was going very well and making a big difference in July 2017. R. 32. But, again, these general comments about improvement do not identify a baseline and thus it is difficult to tell whether they are inconsistent with the functional limitations that Ms. Chiara identified.

### b) Physical Therapist Patrick McCrystal

Mr. McCrystal completed a physical therapy evaluation on December 10, 2015. R. 499. In it, he opined that Mr. Gustafson could stand for five minutes; ambulate 100 feet; climb seven sets of stairs; drive up to one hour; had limited cervical range of motion; had limited lumbar

spine range of motion; and showed significant limitations in activities of daily living. R. 499-501. The ALJ did not consider this opinion evidence at all.

Mr. McCrystal's opinion qualifies as an "other source." *Acevedo v. Colvin*, 20 F. Supp. 3d 377, 389 (W.D.N.Y. 2014) ("[A] physical therapist is an 'other source' whose opinion the ALJ may consider regarding the severity of a claimant's impairment and how it affects the claimant's ability to work. . . .[a]lthough physical therapists are not acceptable medical sources, the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence."). The Commissioner concedes that "physical therapist Patrick McCrystal provided an opinion, which the ALJ did not evaluate," but argues that the evaluation is "merely a part of [Mr. Gustafson's] own subjective reporting" and therefore "did not constitute a statement from a medical source reflecting judgment about the nature and severity of the impairments . . . [or Mr. Gustafson's] specific retained abilities and limitations." ECF No. 22-1 at 11-12. But there is a separate "subjective history" section of Mr. McCrystal's evaluation and there is no indication that the subsequent "medical history," "pain," and "range of motion" sections are also subjective, R. 499-500, or that Mr. McCrystal's overall "assessment," which states that "[Mr.Gustafson] shows significant limitations [in] all aspects of [activities of daily living]," has "high pain levels" and "decreased tolerance to gentle [range of motion]," R. 501, is anything but Mr. McCrystal's own objective view.

### 4. *Reevaluation on Remand*

Remand is unnecessary "where application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (internal quotation marks, citations, and alterations omitted); *see also Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Of course, where application of the correct legal principles to the

record could lead to only one conclusion, there is no need to require agency reconsideration."). Here, although the ALJ identifies evidence suggesting that Mr. Gustafson's functional capacity is greater than he alleges, the opinions by Dr. Menoutis, Dr. Abeles, Ms. Chiara, and Mr. McCrystal differed so sharply from the ALJ's RFC determination that I am unable to conclude that the correct application of the treating physician rule and the rules regarding the evaluation of the opinions of other sources could have led to only one conclusion. Remand is therefore warranted.

Dr. Menoutis's opinion differed from the ALJ's assessment of Mr. Gustafson's functional capacity in several important respects. First, the ALJ determined that Mr. Gustafson "can turn his head up to 60 degrees to the right and left," R. 25, while Dr. Menoutis determined that he can "rarely" turn his head right or left, R. 824. Second, the ALJ determined that Mr. Gustafson "could perform simple, routine, repetitive tasks," R. 25, while Dr. Menoutis determined that his pain or other symptoms would "frequently" or "constantly" interfere with the attention and concentration needed to perform even simple work tasks, R. 823. Third, the ALJ determined that Mr. Gustafson "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)," R. 25, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Dr. Menoutis opined, however, that Mr. Gustafson could never lift and carry more than 10 pounds. R. 824. In addition, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 26. But Dr. Menoutis's findings about Mr. Gustafson's impairments and symptoms,

R. 822, provide support for Mr. Gustafson's statements "concerning the intensity, persistence and limiting effects of [his] symptoms."

Dr. Abeles's opinion also differed from the ALJ's assessment of Mr. Gustafson's functional capacity in several ways. First, the ALJ determined that Mr. Gustafson "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)," R. 25, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Dr. Abeles opined, however, that Mr. Gustafson could never lift more than 10 pounds and that he could never carry more than 5 pounds. R. 566. Second, light work may involve "sitting most of the time with some pushing and pulling of arm or leg controls," 20 C.F.R. § 404.1567(b), but Dr. Abeles found that Mr. Gustafson could sit for only 3 hours during an 8-hour workday and could not push and pull arm controls with his left hand, R. 565-66. Third, the ALJ found that Mr. Gustafson "could frequently . . . crawl," R. 25, while Dr. Abeles found that he could "never" crawl, R. 566.

The "other source" opinions are also in conflict with components of the ALJ's RFC determination. As to Ms. Chiara, her opinion conflicts most clearly with the ALJ's determination that Mr. Gustafson "could perform simple, routine, repetitive tasks." R. 25. She stated that his symptoms would "constantly" interfere with the attention and concentration needed to perform simple work tasks, R. 641; and that his "[c]urrent symptoms include inability to focus [and] carry out tasks with multiple steps," R. 647; *see also* R. 644-46 (noting that he would have great difficulty with understanding, memory, concentration, persistence, social interaction, and adaption); R. 649-50 (noting similar symptoms and limitations); R. 651-54 (noting difficulty with daily living activities, social functioning, and maintaining concentration). As to Mr.

McCrystal, his opinion that Mr. Gustafson had limited cervical and lumbar spine range of motion, R. 500, conflicts with the ALJ's determination that Mr. Gustafson could "turn his head 60 degrees to the right and left," R. 25.

In sum, had the treating physician rule been properly applied and the other sources properly evaluated, it is possible that the ALJ would have assigned greater weight to the opinions by Dr. Abeles, Dr. Menoutis, Ms. Chiara, and Mr. McCrystal; because their opinions diverged from the ALJ's RFC determination, assigning their opinions greater weight may have led the ALJ to formulate a different RFC. Remand is therefore required with respect to Mr. Gustafson's application for supplemental security income.

### B. DIB

Although the parties do not separately discuss the ALJ's decision with respect to disability insurance benefits, the time period relevant to DIB differs from the period relevant to SSI; because there is so little medical evidence concerning the period of eligibility for DIB, a separate analysis of this issue is required.

### 1. *Relevant Time Period*

For a claimant to receive disability benefits, his disability onset date must fall prior to his date last insured. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) ("[T]he applicant must have 1) adequate social security earnings to be 'fully insured'; and 2) 'disability insured status' in the quarter he became disabled or in a later quarter in which he was disabled.") (internal citations omitted); *Mauro v. Berryhill*, 270 F. Supp. 3d 754, 762 (S.D.N.Y. 2017) ("[W]hen a claimant does not show that a currently existing condition rendered her disabled prior to her date last insured, benefits must be denied."), *aff'd sub nom. Mauro v. Comm'r. of Soc. Sec.*, 746 Fed. Appx. 83 (2d Cir. 2019). Here, the ALJ determined that Mr. Gustafson last met the requirements

for insured status on December 31, 2015, R. 20, and the parties do not contest this finding, ECF No. 21-2 at 4. In addition, Mr. Gustafson alleges a disability onset date of October 1, 2014. R. 19. Thus, with respect to his application for disability insurance benefits, Mr. Gustafson must prove that he was disabled within the meaning of the Social Security Act between October 1, 2014 and December 31, 2015; he cannot establish eligibility for disability benefits on the basis of a present disability—no matter how serious—unless he became disabled during the relevant time period. *Behling v. Comm'r. of Soc. Sec.*, 369 Fed. Appx. 292, 294 (2d Cir. 2010) (explaining that the "appellant was required to demonstrate that she was disabled as of the date on which she was last insured" and that "new impairments are not relevant"); *see also Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) ("[R]egardless of the seriousness of his present disability, unless [the claimant] became disabled before [the date last insured], he cannot be entitled to benefits.").

### 2. *Retrospective Opinion*

As discussed in a preceding section, Mr. Gustafson treated with Dr. Abeles in 2010 and 2011, did not treat with him for several years, and then re-established care in January 2016. R. 605; ECF No. 21-2 at 1, 4. Thus, Dr. Abeles was not a treating physician for the time period relevant to the DIB application. Although the treating physician rule "does not technically apply when the physician was not the treating physician at all during the relevant time period," *Rogers v. Astrue*, 895 F. Supp. 2d 541, 549 (S.D.N.Y. 2012), the opinion by Dr. Abeles may still be entitled to "significant weight" as a retrospective opinion. His report indicated that he was treating Mr. Gustafson for "[d]isc disease," which was "a pre-existing condition" with an approximate onset date in "[A]ug 2015." R. 564. This reference to an onset date during the relevant period suggests that the opinion may be retrospective. *Martinez v. Massanari*, 242 F. Supp. 2d 372, 378 (S.D.N.Y. 2003) (noting that a physician who began treating the claimant

seventeen months after the last insured date "acknowledged a continuity of back problems commencing well before the date last insured," and explaining that the ALJ was thus "obligated . . . to explore the possibility that the diagnoses applied retrospectively to the insured period").

"While [a retrospective] opinion will necessarily lack the exactitude of a contemporaneous diagnosis from the treating physician, it is certainly entitled to deference in the absence of contradictory evidence." *Campbell v. Barnhart*, 178 F. Supp. 2d 123, 136 (D. Conn. 2001); *see also Martinez*, 242 F. Supp. 2d at 377 ("The retrospective opinion of a doctor who is currently treating a claimant is entitled to significant weight even though the doctor did not treat the claimant during the relevant period.") (internal quotation marks omitted). "Indeed, [the Second Circuit has] regularly afforded significant weight to [retrospective] opinions." *Monette v. Astrue*, 269 Fed. Appx. 109, 113 (2d Cir. 2008); *see also Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (reversing the Secretary's denial of benefits where a physician who began treating the claimant in 1973 testified that the claimant had "probably" been disabled since 1967, explaining that "[w]hile [the physician] did not treat the appellant during the relevant period," "his opinion is still entitled to significant weight"). A "retrospective opinion" from a treating physician should thus be "afforded significant weight by the ALJ in the absence of contradictory medical evidence or overwhelmingly compelling non-medical evidence." *Butler v. Colvin*, 2014 WL 6909529, at *14 (E.D.N.Y. 2014).[4]

---

[4] In fact, some courts have gone even further, finding that "the treating physician rule applies to retrospective diagnoses, those relating to some prior time period during which the diagnosing physician may or may not have been a treating source, as well as to contemporaneous ones," "mean[ing] that a retrospective diagnosis by a treating physician is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." *Martinez*, 242 F. Supp. 2d at 377 (internal quotation marks omitted); *see also Gercke v. Chater*, 907 F. Supp. 51, 52 (E.D.N.Y. 1995) ("Even if the treating physician's opinion is

The ALJ did not assess whether Dr. Abeles's opinion constituted a retrospective opinion with respect to Mr. Gustafson's application for disability benefits. Moreover, the only evidence that the ALJ identifies between October 1, 2014 and December 31, 2015 as "inconsistent" with Dr. Abeles's opinion is an x-ray from November 2015 that "showed no acute abnormalities." R. 32. But as noted above, simply because there were no "acute" abnormalities does not mean that there were no abnormalities capable of causing the functional limitations identified by Dr. Abeles. Indeed, while treatment notes in Exhibit 3F—the same exhibit the ALJ cited to support his finding of no acute abnormalities—do state that "no acute abnormality is radiographically demonstrated," the notes also explain that "[c]ervical spondylosis [is] most notable at C5-C6 and C6-C7," R. 515, that there is "moderate intervertebral disc height loss with endplate sclerosis and spurring at C6-C7," R. 515, that he has "polyneuropathy," R. 511, and that he has limited cervical range of motion and limited lumbar spine range of motion, R. 512. The ALJ failed to explain how a medical record showing less-than-acute abnormalities and limited range of motion "contradict[s]" Dr. Abeles's opinion. Thus, remand is warranted with respect to Mr. Gustafson's application for DIB so that the ALJ can determine whether Dr. Abeles's opinion constituted a retrospective opinion and, if so, whether it is entitled to significant weight.

---

retrospective, the opinion is binding on the Commissioner unless contradicted by other medical evidence or overwhelmingly compelling non-medical evidence.") (internal quotation marks omitted).

## III.    CONCLUSION

For the reasons set forth above, Mr. Gustafson's motion, ECF No. 21, is GRANTED and the Commissioner's motion, ECF No. 22, is DENIED. The case is hereby REMANDED to the Commissioner for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            September 30, 2019